UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

RASHID RAHMAN,

                    Petitioner,                    17 Civ. 8186

          -against-                                OPINION AND
                                                   ORDER
JAMIE M. LAMANNA, SUPERINTENDENT,
SHAWANGUNK CORRECTIONAL FACILITY,

                    Respondent.

-------------------------------------X

A P P E A R A N C E S:


          Pro Se

          Rashid Rahman
          DIN No. 12-A-4089
          Shawangunk Correctional Facility
          P.O. Box 750
          200 Quick Road
          Wallkill, NY 12589-0700


          Attorney for Respondent

          THE BRONX DISTRICT ATTORNEY'S OFFICE
          198 East 161st Street
          Bronx, NY 10451
          By:  Dmitriy Povazhuk, Esq.
               Nancy Darragh Killian, Esq.

DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/5/19

Sweet, D.J.

Petitioner Rashid Rahman ("Rahman" or the "Petitioner") filed this action pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus (the "Petition," Dkt. No. 2). For the reasons set forth below, the petition is denied.

Prior Proceedings

Rahman filed his petition *pro se* on October 23, 2017, alleging that he is being held in state custody in violation of his federal constitutional rights.

Petitioner's state custody arises from a judgment of conviction entered on March 10, 2014, in the Supreme Court of the State of New York, Bronx County, convicting him of Burglary in the Second Degree (N.Y. Penal Law § 140.25[2]), two counts of Attempted Assault in the First Degree (N.Y. Penal Law §§ 110/120.10[1], [4]), and one count of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[1][b]). Petitioner was sentenced, as a second felony offender, to a

determine term of fifteen years, followed by five years of post-release supervision.[1]

His conviction was affirmed by the Appellate Division, First Department (the "Appellate Division"), on March 10, 2016, and leave to appeal to the New York State Court of Appeals was denied on August 11, 2016. *People v. Rahman*, 137 A.D.3d 523 (App. Div.), *leave to appeal denied*, 28 N.Y.3d 935 (2016). Petitioner is currently incarcerated at the Shawangunk Correctional Facility pursuant to that judgment of conviction.

Petitioner has challenged the constitutionality of the testimony of one of the Government's witnesses, his right to be present at all material stages of trial, his right to counsel, his waiver of his right to a jury trial, the effectiveness of his representation at sentencing, and the length of his sentence.

The State Court Proceedings

[1]    Rahman was initially sentenced to determinate terms of fifteen years of imprisonment, to be followed by five years of post-release supervision, on the burglary and weapon possession counts, and indeterminate terms of seven and one-half to fifteen years imprisonment on the two attempted assault counts. However, as Rahman was a second felony offender, the sentences on the assault counts could not have been indeterminate terms. As a result, Petitioner was later resentenced to determinate terms of fifteen years of imprisonment followed by five years of post-release supervision for each of the attempted assault convictions, to run concurrently with the related convictions.

Petitioner's conviction arose out of a burglary that took place on December 10, 2009. *See* Povazhuk Decl. Ex. 2, Dkt. No. 9, at 4-7. In brief, the facts of the burglary and subsequent proceedings are as follows.[2]

a. The Crime

On December 10, 2009, two individuals attempted to forcibly enter the apartment of Dennis Pimentel ("Pimentel") at 1504 Sheridan Avenue in the Bronx. The first person, Jenny Ramirez ("Ramirez"), knocked on the door of Pimentel's apartment, pretending to be a resident of the building who wanted Pimentel's signature. When Pimentel opened the door, a man standing behind Ramirez pushed his way in. During the struggle that ensued, the man removed a firearm from his waistband and fired a gunshot toward Pimentel's stomach. The gunshot pierced Pimentel's shirt, leaving a hole, but left Pimentel unharmed. Though she never saw a gun, Ramirez heard the shot go off and fled the building. Pimentel fled his apartment

---

[2]     The facts described in this section are derived from the Petition, Dkt. No. 2, as well as the Declaration of Assistant District Attorney Dmitriy Povazhuk and the exhibits attached thereto, Dkt. No. 9.

through the fire escape and called 911 about 20 or 25 minutes
later.

b. The Investigation

At around 11:30 p.m. on the night of the burglary,
Police Officer Tara Morel ("Officer Morel") from the Bronx
Evidence Collection Unit responded to Pimentel's apartment.
Officer Morel recovered from Pimentel's foyer a shell casing
from a .380 caliber bullet and a t-shirt, which had a hole in
it. The following day, Detective Michael Clohessy ("Detective
Clohessy") was assigned to investigate the burglary. As part of
his investigation, Detective Clohessy called Pimentel. Pimentel
described the two perpetrators as a short Hispanic woman and a
black Hispanic male, "27 to 35 years of age, 182 to 210 pounds."
After reviewing the other police paperwork prepared before he
was assigned to the investigation, and after speaking with
Pimentel, Detective Clohessy understood the male perpetrator to
be African-American, rather than Hispanic.

In the days following the burglary, Pimentel also
reported to Detective Clohessy that he had received about 13
phone calls from a number that was later determined to belong to

4

a man named Miguel Maldonado ("Maldonado"). Maldonado was also Ramirez's boyfriend at the time. When shown a photo array that included a picture of Maldonado, Pimentel picked out Maldonado's picture and said that he knew him from the street by his nickname "Maze," but did not identify Maldonado as having been involved in the robbery. An eye witness also identified Maldonado as having been present at the scene of the crime.

Maldonado is a dark-skinned Hispanic male, who was approximately 28 years old, 5'10" and 190 pounds at the time of the incident. Petitioner is an African-American male, who was approximately 6'5" tall and 40 years old at the time of his arrest.

When Maldonado was later arrested for another robbery, he informed the arresting officer that he would be able to assist in the investigation of the Pimentel robbery, and that the person responsible for that crime was named "Rashid." Maldonado also told Detective Clohessy that he could provide a female witness who would testify about the Pimentel robbery and could help locate the gun that was used during it, but wanted to be released from prison before he would provide additional information.

Detective Clohessy then subpoenaed Maldonado's phone records and searched for all of the numbers that Maldonado had called or received calls from on the day of the burglary. Detective Clohessy used internal police department databases to connect one of these numbers to Petitioner, and subsequently subpoenaed Petitioner's phone records. According to the cell phone site information, the phone was "hitting" cell phone sites near the location of the burglary around the time that it occurred.

On January 13, 2010, Detective Clohessy showed Pimentel a photo array that included a picture of Petitioner. Pimentel pointed to the picture of Rahman and identified Rahman as the person he struggled with during the robbery.

On February 3, 2010, Rahman was arrested. Rahman was advised of his *Miranda* rights, and said that he understood them but was willing to listen to Detective Clohessy. After Detective Clohessy told Rahman that Maldonado's statements and Rahman's phone records implicated him in the robbery, Rahman stated that he was "being set up" by Maldonado. Rahman had been dating Maldonado's sister, Grace Morales ("Morales"), and stated that

he believed he was in the Bronx with her on the night in question. Rahman also told Detective Clohessy that he was on Sheridan Avenue on the day of the burglary, but only to get some money from Maldonado. He stated that the phone calls made to Maldonado on that day were actually made by Morales. He further explained that he had a paying job at the time of the incident and therefore had no motivation to commit a robbery. He argued that Maldonado was setting him up because Petitioner had slapped him in the face once after Maldonado said something crude to Morales.

On the day of Rahman's arrest, the police picked up Morales and brought her to the police station for an interview. Morales told Detective Clohessy that she was not with Rahman on December 10, 2009. After the interview, Morales was in a police cruiser when she received a call from Rahman. During the call, Petitioner asked Morales if she remembered "the time they were up in the Bronx to get $50 from her brother so they could go to a hotel," to which Morales responded that she did not remember. Petitioner asked Morales to make some calls on his behalf, and Morales agreed to do so.

Detective Clohessy next arranged for Pimentel to view a lineup, in which Petitioner was in position number three. During the lineup, Petitioner raised one of his hands, with his index finger and thumb extended to form the shape of a gun, and brought it to his face. He put his index finger to the interior corner of his eye, and then moved it slowly down and across his cheek. A detective inside the lineup room told Petitioner to put his hand down. Petitioner initially complied but then proceeded to repeat the same hand gesture a second time. Upon seeing the second hand movement, Pimentel walked out of the viewing room, and asked to leave the precinct. Pimentel told Detective Clohessy that "the guy saw [him]." Detective Clohessy asked him "which guy," and Pimentel identified Petitioner's lineup number and said "that's the guy who pushed in the door." Detective Clohessy asked Pimentel to sign the bottom of the lineup report to indicate that he had identified the person in position number three, *i.e.*, Petitioner. Pimentel marked the lineup report accordingly.

On May 21, 2010, Pimentel testified in the Grand Jury after receiving a subpoena. When recounting his experience during the lineup to the Grand Jury, Pimentel said that he believed that Petitioner, through his hand gestures, was trying

to say "I see you [and] know who you are." Pimentel said that Petitioner's conduct made him fear for his safety at the time of the lineup and "every day" after it. Pimentel also stated "for the record that the only reason [he was] [t]here [was] because [he] got subpoenaed."

Maldonado and Ramirez were arrested on March 16, 2011 and May 7, 2011, respectively. After her arrest, Ramirez entered into a cooperation agreement with the District Attorney's Office. Ramirez cooperated fully in the investigations and prosecutions of Petitioner and Maldonado, and was consequently permitted under the terms of the cooperation agreement to withdraw her guilty plea to first-degree burglary and re-plead to second-degree criminal trespass, and received a non-incarceratory sentence.

By Bronx County indictment number 1979/2010, Petitioner was charged with two counts of first-degree burglary; one count of second-degree burglary; two counts of attempted first-degree assault; two counts of attempted second-degree assault; one count of second-degree criminal possession of a weapon; two counts of second-degree criminal use of a firearm;

and one count of third-degree intimidation of a victim or
witness.

## c. Waiver of Jury Trial

Before Petitioner's trial began, and after an off-the-
record bench conference between counsel and the court, Rahman
elected to proceed in a bench trial. Rahman executed the jury
waiver form. Before finalizing Rahman's waiver, the court
stated:

> Before we finalize the execution, Mr. Rahman, the
> court has been informed that you wish to proceed with
> the bench alone without a jury; is that correct? And I
> am sure [counsel] has gone over the pitfalls that
> could happen on such a situation, and what I mean by
> that is that you, yourself, actually would pick the
> jury along with counsel and the court, and all 12
> jurors would have to be unanimous in any determination
> as to your guilt or non-guilt as the case may be. So
> you're starting with 12 people. Even one person who is
> not fully convinced could work to your advantage. By
> going before the bench there is only one person, which

is me, who will be both the finder of facts and the
arbitrator of the law. So the odds, so[] to speak,
change a little bit, and you should be aware of that
and I am making you aware of it and reinforcing what
[counsel] already said I am certain to you. And it's
still your intention, you feel strong enough about
your case to go forward before the bench?

Rahman responded, "Yes sir, I do, your honor." The
court did not ask Petitioner if he had elected to waive a jury
trial based on any promises of a particular sentence or leniency
should he be convicted. Rahman attempted to question the court
further before signing the waiver, at which time the court
directed him to confer with counsel. After that, Petitioner and
his counsel executed the waiver form, which was in turn signed
by the judge.

d. The Trial Testimony

*1. Detective Clohessy*

During trial, Detective Clohessy testified about his
initial investigation of the crime and how he identified Rahman

11

as a potential suspect. He testified that Rahman denied involvement in the burglary but admitted to being in the Bronx on the night in question. Detective Clohessy further testified about the identification procedures conducted at the precinct.

On cross-examination, the defense elicited information about Pimentel's initial description of the perpetrators, describing the male perpetrator as a "black Hispanic, 27 to 35 years of age, 182 to 210 pounds." Detective Clohessy confirmed that the eye-witness said he saw "two black Dominican[] [men] about five-eight, 170-180 pounds" fleeing the scene of the burglary. Detective Clohessy likewise admitted that there was evidence that Maldonado made a series of threatening phone calls to Pimentel following the incident.

*2. Ramirez*

Ramirez testified that she was Maldonado's girlfriend at the time of the incident, and that on the day of the burglary, she agreed to participate in a home invasion with Maldonado and his friend. According to Ramirez, Maldonado asked her to go inside the building and knock on Pimentel's door, in order to gain entry to steal drugs and money. Ramirez identified

12

the other individual involved in the crime as a person named "Rashid." Ramirez stated that she and "Rashid" entered the building, knocked on Pimentel's door, and that a struggle ensued. She testified that she heard a gun go off, but never saw the gun itself. Ramirez testified that she left the scene in Maldonado's black BMW and that "Rashid" left in a Jeep, which was parked directly in front of the building. After the incident, Ramirez said she spoke on the phone with Maldonado, who told her not to worry about anything and to "[j]ust blame Rashid."

### 3. Strohm

Jason Strohm, a representative from Sprint Nextel, testified about phone records and cell phone tower data. Strohm testified that Rahman's and Maldonado's phones pinged off cellphone towers in the "general vicinity" of 1504 Sheridan Avenue at the time of the burglary. On cross-examination, Strohm testified that there were a series of calls between Maldonado and Rahman between the hours of 6:25 p.m. and 7:38 p.m., and that Rahman's cell phone pinged off of towers in Manhattan beginning around 8:30 p.m., and proceeded to ping off a series of locations heading south over the next hour.

*4. Pimentel*

Before trial, the prosecutor informed the court and
defense counsel that Pimentel had become uncooperative and was
telling the prosecutor that he did not recall picking Petitioner
out of a photo array or identifying him in a lineup. The
prosecutor further explained that if this supposed loss of
memory persisted, the People intended to introduce into evidence
Pimentel's testimony before the Grand Jury as a past
recollection recorded.

Pimentel appeared in court under subpoena as the
People's penultimate witness. Pimentel was appointed counsel,
who advised the court that Pimentel would decline to answer any
questions on Fifth Amendment grounds. Counsel explained that
Pimentel might give answers at trial that were different from
his Grand Jury testimony, and that these inconsistencies would
potentially expose him to a perjury prosecution. The People
contended that this refusal to answer questions was a result of
witness intimidation by Rahman. The Court ultimately ruled that
it would decide, on a question-by-question basis, whether
Pimentel could validly invoke the Fifth Amendment privilege.

At one point, the People asked Pimentel if he remembered somebody trying to break into his house. Pimentel refused to answer on Fifth Amendment grounds. The People suggested that Pimentel's invocation of the privilege against self-incrimination was baseless with respect to this particular question, and accordingly asked the court to interview Pimentel *in camera* on the issue. At that point, the court called Pimentel into chambers for a private interview, outside the presence of Rahman or his counsel. Defense counsel objected to this procedure, but the court overruled the objection. Counsel then stated to the court that his "client [was] asking" whether he had a "right to be present" during the *in camera* interview and the court replied that he did not. The interview apparently was not transcribed and the court did not summarize on the record what had occurred.

After meeting privately with the judge, the witness returned to the open courtroom. The court directed Pimentel to answer the most recent question posed by the People. Pimentel said that he remembered "somebody trying to break into [his] apartment," but did not recall what happened during the attempted break-in. He remembered being shot at, and that a

15

bullet missed his body but went through his t-shirt. The court

also directed the witness to answer several additional questions

posed by the prosecution. When asked about the lineup, Pimentel

said he remembered participating in one, but refused to answer

on Fifth Amendment grounds when asked whether someone in the

lineup formed the shape of a gun with his hand and brought his

hand to his face.

The direct examination of Pimentel came to an impasse

when the prosecution asked additional questions regarding the

lineup procedure, and his attorney advised him not to answer any

questions on that topic. After this back-and-forth, the court

stated: "There is an alternative way, of course, to this whole

impasse and that would be to make the appropriate motion for the

minutes that you do have at a time that you think appropriate in

lieu of further cross—or further examination of this witness."

Following the court's suggestion, the People sought to introduce

the Grand Jury testimony as a past recollection recorded.[3]

---

[3] The People argued that Pimentel's Grand Jury testimony met the criteria
for a past recollection recorded because (1) the witness testified that he
did testify in the Grand Jury on this matter, that he testified under oath,
and that he was truthful; (2) he testified to the best of his ability at that
point in time; (3) the testimony was taken shortly after the incident; and
(4) the witness was testifying at trial that he could not recall the events
of that day and has testified that reviewing the minutes would not refresh
his recollection.

16

Petitioner's counsel objected "in the most strenuous manner possible," asserting that Pimentel had never stated that his "Grand Jury testimony was true and accurate." He further contended that Rahman's right to a fair trial would be compromised by his inability to cross-examine Pimentel about the full scope of his Grand Jury testimony. The court stated that it was "inclined to admit [the] minutes," but permitted Rahman's counsel the opportunity to further research the issue.

Following a recess, Rahman's counsel renewed his argument that Pimentel's Grand Jury testimony was not admissible as a past recollection recorded, in light of his invocation of the privilege against self-incrimination. He specifically argued that the admission of testimony from a proceeding where there had been no opportunity for cross-examination would violate the Confrontation Clause of the Sixth Amendment. The only means of admitting Pimentel's testimony, counsel argued, would be to hold a *Sirois* hearing, where the burden would be on the prosecution to establish by clear and convincing evidence that the witness's unavailability was the result of Rahman's misconduct. If such a hearing were held, counsel further contended, he did not believe that the People could meet their burden.

The prosecutor responded that she was not seeking to admit the testimony on the basis of Rahman's misconduct, but rather as a past recollection recorded, which was appropriate in circumstances where a witness is "faking an inability to recall the facts" for any number of reasons, including intimidation by Rahman. The court ultimately concluded that, "under the unique circumstances presented," Pimentel's Grand Jury testimony was admissible "under the standard enunciated by the People," *i.e.*, as a past recollection recorded.

In his Grand Jury testimony that was admitted into evidence, Pimentel testified as follows:

> Two people attempted to break entry into his house on December 10, 2009 at approximately 8:30 p.m.

> A young lady knocked on his door and when he opened the door someone tried to barge in brandishing a pistol, automatic weapon, and kicked the door.

> A struggle "emerged" and the perpetrator "managed his way inside [Pimentel's] house.

18

A shot went off, piercing Pimentel's shirt.

Pimentel managed to shut the perpetrators out of his house and fled his apartment using the fire escape.

During a subsequent identification procedure on February 3, 2010, someone in the line-up "made a hand gesture like I see you."

When asked "was that the guy that had shot you in you apartment?", Pimentel responded "He resembled the guy, yes, he was."

In light of the court's ruling, Rahman's counsel requested an opportunity to cross-examine Pimentel concerning the substance of his Grand Jury testimony. When Pimentel re-took the stand, he refused to answer any substantive question related to his Grand Jury testimony:

> Q: Would it be fair to say that your memory is not very good today with respect to the incident? A: I refuse to answer on the grounds that it may incriminate me.

Q: Isn't it a fact, sir, that you did not pick anybody out of that photo array? A: I refuse to answer on the grounds that it may incriminate me.

Q: Now did anything occur at that viewing that got you scared? A: I refuse to answer on the grounds that it may incriminate me.

Q: Did anybody during the time you were viewing that lineup make any threatening gesture at you? A: I refuse to answer on the grounds that it may incriminate me.

Q: Did a person in that lineup take his right hand and his middle finger and clean the corner of his right eye? A: I refuse to answer on the grounds that it may incriminate me.

e. The Verdict and Sentencing

After hearing the evidence, the court found Rahman guilty of Burglary in the Second Degree, two counts of Attempted

Assault in the First Degree, and Criminal Possession of a Weapon in the Second Degree.

On March 31, 2013, Rahman appeared for sentencing. The New York Penal Law provided for determinate sentences of between 7 and 15 years for each of Rahman's convictions, with a mandatory period of 5 years' supervision. The People recommended the maximum term for all four offenses, to be served concurrently, but erroneously recommended an indeterminate sentence for the Attempted Assault counts. The People also asked that the sentences be imposed consecutively to defendant's recently-imposed 6-year sentence for Criminal Sale of a Controlled Substance in Kings County. Defense counsel asked for the minimum sentence and asked that it run concurrently with the Kings County sentence. In favor of this argument, Petitioner's trial counsel only stated: "In any case, Your Honor, nobody got hurt. It was not a completed act. My client did get caught. Seven years is a considerable amount of time and five years' post-release supervision is also considerable time." Counsel made no argument about any mitigating factors that might weigh in favor of a more lenient sentence. The court imposed the People's requested sentence.

On April 8, 2013, the State of New York Department of Corrections sent the court a letter about Rahman's sentence, explaining that New York law required determinate sentences for second felony offenders and that Rahman's sentence should be adjusted accordingly. At a subsequent hearing on May 15, 2013, the parties disagreed about the scope of resentencing. Defense counsel contended that the court had the authority to reexamine Rahman's entire sentence, while the People argued that the court had only the limited power to correct the indeterminate sentences imposed for Rahman's two Attempted Assault convictions. The court ordered the parties to provide written submissions on this issue.

Counsel filed a motion on September 5, 2013, requesting modification of Rahman's entire sentence. He asked the court to consider the following mitigation factors, which he acknowledged he had not presented at the original sentencing hearing:

> Mr. Rahman entered the penal system at the tender age of 18, he spent the next 20 years incarcerated for a crime he claims he did not commit . . . . However to Mr. Rahman's credit, he used his 20 years

productively, first earning an Associate[']s Degree in
Paralegal Studies, from Bronx Community College
outreach program at Sing Sing Correctional Facility.
Later, through an outreach program sponsored by Mercy
College, Mr. Rahman earned a Bachelor of Arts degree
in Human Psychology. He was a model inmate who
received numerous accommodations and distinctions
during his imprisonment which resulted in release on
parole after 20 years .... While Mr. Rahman was out in
society, he did construction and building work for
Workman's Circle, at various construction sites in the
Bronx and Manhattan. He has a 22 year old daughter,
Jamilah Rashid, who is a veteran employee at Home
Depot. Mr. Rahman now is 44 years of age. His parents
are deceased and he has a brother who [sic] disabled
and hospitalized. He has spent more than half of his
life incarcerated, and yet I seek leniency from this
court. I would ask the court to consider how such a
long period of incarceration can do to a young
impressionable youth.

Counsel explained that his failure to offer such mitigation evidence previously was not a strategic decision, but rather a result of his failure to prepare:

> On the day of sentence for Mr. RAHMAN, 3/21/13, Counsel was unprepared to proceed to sentence due to the numerous cases (6) already scheduled for that date. Instead of seeking an adjournment for sentencing, Counsel, trying to accommodate all of the parties, including the court, simply did not make a sufficient and proper record on behalf of Mr. RAHMAN at his sentencing due to a mistaken belief that the court would sentence Defendant in a range between 7 years definite to 10 years definite on the four counts to run concurrently to each other and concurrent with the Defendant's Kings County conviction for Criminal Sale of a Controlled Substance in the Third Degree. Counsel never considered that the court would impose a consecutive sentence because there was never any mention of consecutive time at any time during the proceedings, and therefore never addressed the consecutive component of the sentence on the sentence date. Further basis for Counsel's erroneous notion had

24

its genesis in the fact that the court made numerous attempts to secure sentence of less than 10 years for Defendant.

The court ruled that it did not have authority to modify Rahman's entire sentence, and accordingly did not reach the mitigation arguments in counsel's submission.

The court amended Rahman's sentence, imposing a determinate sentence of 15 years' imprisonment and 5 years' post-release supervision for each of the attempted assault convictions, to run concurrently with the sentences for the related convictions.

## f. Post-Trial Proceedings

On August 10, 2015, on direct appeal to the Appellate Division, First Department, Petitioner asserted through counsel that:

> 1. The admission, over objection, of the
>    complainant's grand jury testimony without an
>    opportunity for cross examination violated

Rahman's rights to confrontation and due process
under *Crawford v. Washington*, 541 U.S. 36 (2004),
the Sixth and Fourteenth Amendments of the United
States Constitution, and Article I, Section 6 of
the New York Constitution;

2. Rahman's right to be present and right to counsel
was violated when the court interviewed the
complainant *in camera* outside the presence of
Rahman or his counsel;

3. Rahman's waiver of his constitutional right to a
jury trial was invalid; and that

4. Rahman was afforded ineffective assistance of
counsel at the sentencing phase of his trial, and
his sentence should be reduced.

On March 10, 2016, the Appellate Division unanimously
affirmed the judgment. *Rahman*, 137 A.D.3d at 523-525.
Specifically, the court found that:

1. While the admission of the complainant's grand
jury testimony, coupled with the complainant's
extensive invocation of the right against self-
incrimination, violated Petitioner's rights to

26



confrontation, there was no reasonable
possibility that this error contributed to the
conviction given the extensive direct and
circumstantial evidence establishing all of the
elements of the crimes;

2. Petitioner's exclusion from a proceeding where
the complainant discussed his invocation of the
Fifth Amendment with the trial court did not
violate his right to be present at a material
stage of the trial because the proceeding
concerned legal matters and did not involve
testimony about which Petitioner had special
knowledge;

3. Petitioner's claim that his attorney's exclusion
violated Petitioner's right to counsel was
meritless and not preserved for appeal;

4. Petitioner's challenge to his waiver of the right
to a trial by jury was not preserved for appeal;
and

5. Petitioner received effective assistance of
counsel at sentencing, and there was no basis for
reducing his sentence or running it concurrently
with his Kings County sentence.

On April 7, 2016, Petitioner applied for leave to appeal the Appellate Division decision. This application was denied on August 11, 2016.

On October 23, 2017, Rahman filed the instant Petition for a writ of habeas corpus, raising all the grounds that were raised in his direct appeal.

Applicable Standard

Section 2254 of the AEDPA provides a federal remedy for state prisoners if their continued custody is in violation of federal law. 28 U.S.C § 2254(a); *see Chandler v. Florida*, 449 U.S. 560, 571 (1981) ("This Court has no supervisory authority over state courts, and, in reviewing a state court judgment, we are confined to evaluating it in relation to the Federal Constitution."). Errors of state law are not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Petitioners bear the burden of proving violations of federal law by a preponderance of the evidence. *See Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012).

A state court's adjudication as to whether a defendant's constitutional rights have been violated may be overturned only if it either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8 U.S.C. § 2254(d)(1)-(2); *see Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

With respect to the "contrary to" clause, the writ may issue in two circumstances: first, if the state court decision "applies a rule that contradicts the governing [Supreme Court] law"; and second, if the state court decision addresses a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrives at a result different to that reached by the Court. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams*, 529 U.S. at 405-06). The "clearly established Federal law" refers to Supreme Court holdings, as opposed to the *dicta*, as of the time of the relevant state court decision. *See Williams*, 529 U.S. at 412. A state court decision involves an "unreasonable application" of Supreme Court precedent when the

29

state court either "identifies the correct governing legal rule" from the Supreme Court's cases but "unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

Under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. "Rather, it is the habeas applicant's burden to show that the state court applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). Determinations of factual issues made by a state court must be presumed correct unless the petitioner can show by clear and convincing evidence that such presumption should not apply. *See* 28 U.S.C. § 2254(e)(1).

In addition, the Supreme Court's jurisprudence on the "unreasonable application" clause of § 2254(d)(1) makes "clear that whether a state court's decision was unreasonable must be

in light of the record the court had before it." *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "If a claim has been adjudicated on the merits by a state court, a federal habeas Petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Cullen v. Pinholster*, 563 U.S. 170, 184 (2011).

## Ground One: The Admission of Pimentel's Grand Jury Testimony

Petitioner contends that the admission of Pimentel's Grand Jury testimony, coupled with Pimentel's repeated invocation of his Fifth Amendment right against self-incrimination, violated Petitioner's right to confrontation and Due Process under *Crawford v. Washington*, 541 U.S. 36 (2004). The Appellate Division, reviewing this claim on direct appeal, found that although this indeed was error, the error was harmless because there was overwhelming direct and circumstantial evidence against Petitioner, and there was thus "no reasonable possibility that the error contributed to the conviction." *Rahman*, 137 A.D.3d at 524. This finding was neither contrary to nor an unreasonable application of Supreme Court precedent.

The standard for harmless error on direct review is the test established by *Chapman v. California*, which held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. The Supreme Court has provided a framework for applying the *Chapman* standard to Confrontation Clause errors on direct appeal: "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). "This inquiry depends on many factors, including 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Gutierrez v. McGinnis*, 389 F.3d 300, 308 (2d Cir. 2004) (quoting *Van Arsdall*, 475 U.S. at 684).

"In a collateral proceeding, the test is different." *Davis v. Ayala*, 135 S. Ct. 2197 (2015). When a federal court reviews a state court finding of harmless error beyond a

reasonable doubt under the AEDPA, it "may not award habeas relief under § 2254 unless the *harmlessness determination itself* was unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119 (2007). A state court decision is not unreasonable if "fairminded jurists could disagree on the correctness of that decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks and citation omitted). Thus, this Court may not provide relief if it merely finds a "reasonable possibility" that the error was harmful. *Davis*, 135 S. Ct. at 2198. Instead, relief is available only if the federal court has "grave doubt about whether a trial error of federal law" had a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Additionally, to afford relief, there must be a finding that the petitioner was "actually prejudiced" by the error. *Davis*, 135 S. Ct. at 2198.

"Applying the constitutional standard for harmless error, New York courts dismiss Confrontation Clause errors as harmless when 'in light of the totality of the evidence, there is no reasonable probability that the error affected the jury's verdict.'" *Chrysler v. Guiney*, 806 F.3d 104, 120 (2d Cir. 2015) (quoting *People v. Douglas*, 4 N.Y.3d 777, 793 (2005)).

A fairminded jurist could find that standard satisfied in this case. There was ample direct and circumstantial evidence establishing all of the elements of the crimes.

Jenny Ramirez, a cooperating eyewitness, provided a full account of the crime. Ramirez's testimony was corroborated by the shell casing and punctured shirt recovered from the crime scene, as well as Petitioner's cell phone records, which showed him communicating numerous times with Maldonado on the day of the crime and which put Petitioner in the vicinity of Pimentel's apartment at the time of the crime.

Moreover, Petitioner's own words put him at the scene of the crime with one of his co-conspirators. Petitioner admitted to Detective Clohessy that he was with Maldonado on Sheridan Avenue on December 10, 2009. Petitioner's explanation for why he was there at that time—that he and Morales had gone to the Bronx to retrieve $50 from Maldonado—was refuted by Morales's testimony that she and Petitioner were not together in the Bronx on that day. Significantly, Morales also testified that, shortly after the burglary, Petitioner called her and said that he had shot somebody.

A fairminded jurist, looking at the totality of this evidence, could conclude that Pimentel's Grand Jury testimony did not have a reasonable possibility of contributing to Petitioner's conviction. Consequently, the Appellate Division's harmless error determination was not an unreasonable application of the *Chapman* standard, and Rahman's petition for a writ of habeas corpus on this ground is denied.

## Ground Two: The Exclusion of Petitioner and His Counsel From the *In Camera* Interview of Pimentel

Petitioner contends that he was deprived of both his right to be present at a material stage of the trial and his right to counsel when he and his attorney were excluded from an *in camera* discussion between the trial court and Pimentel regarding Pimentel's invocation of his Fifth Amendment rights. However, for the reasons stated below, these claims must fail.

### a. The Right to Counsel Claim

Petitioner's right to counsel claim is forfeited for collateral review because the Appellate Division rejected that claim based on a lack of preservation.

Federal habeas review of a claim is generally prohibited if a state court rests its judgment on an independent

35

and adequate state ground. *See Walker v. Martin*, 562 U.S. 307, 316 (2011). This doctrine "applies whether the state law ground is substantive or procedural," *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), though the adequacy of a state procedural bar is a question of federal law. *Lee v. Kemna*, 534 U.S. 362, 375 (2002). Generally speaking, violation of "firmly established and regularly followed state rules" will be adequate to foreclose review of a federal claim. *Id.* (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). However, in some "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate," the federal claim may be reviewable. *Id.*

A state procedural default qualifies as an independent and adequate state ground where "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989). Additionally, where "the last reasoned opinion on the claim explicitly imposes a procedural default, [courts] presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

In this case, the Appellate Division rejected Petitioner's right to counsel claim based on the independent and adequate state procedural bar of preservation. New York's preservation rules, *see* N.Y. Crim. Proc. L. § 470.05, are consistently applied. *See Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999) (noting that the Second Circuit has "observed and deferred to New York's consistent application of its contemporaneous objection rules"). Nor is there any reason to believe that the contemporaneous objection rule was misapplied in this case. Although Rahman's counsel objected to the *in camera* proceedings generally and alluded to his client's right to be present, counsel never asserted that his absence from the interview would have a detrimental effect on his ability to cross-examine Pimentel. Given this failure to make an objection of the requisite level of specificity, the Appellate Division reached a reasonable conclusion when it deemed Rahman's claim unpreserved. *Cf. Garcia*, 188 F.3d at 81 (Appellate Division reasonably deemed claim unpreserved where it "was not brought to the trial court's attention in a way or in such a manner as to give the trial judge an opportunity to remedy the problem and avert reversible error") (internal quotation marks omitted).

37

Because there is an independent and adequate
determination by the Appellate Division that Rahman procedurally
defaulted on this claim, it cannot be the basis for habeas
relief unless Rahman can show either (1) cause for his default
and actual prejudice, or (2) that the Court's failure to
consider his claim will result in a fundamental miscarriage of
justice. *See Harris*, 489 U.S. at 262. Here, Rahman has shown
neither cause and actual prejudice nor that the default will
result in a fundamental miscarriage of justice. In his Appellate
Division brief, Petitioner maintained that his right to counsel
was violated because Pimentel's statements in his *in camera*
interview would have provided a basis for cross-examination by
trial counsel. However, Pimentel's extensive assertion of his
Fifth Amendment privilege at trial would have rendered any
impeachment impracticable. Accordingly, Rahman's right to
counsel claim is unreviewable.

## b. The Right to Be Present at a Material Stage of Trial Claim

The Appellate Division's conclusion that the court did
not violate Rahman's right to be present at a material stage of
the trial by excluding him from the *in camera* proceeding was not

an unreasonable application of, nor contrary to, clearly
established federal law.

        The Fourteenth Amendment entitles a defendant to be
present in his own person whenever his "presence has a relation,
reasonably substantial, to the fullness of his opportunity to
defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97
(1934). In order to decide whether this right was violated,
courts must consider "whether, in light of the record as a whole
. . . the defendant's presence at the proceeding in question
would have contributed to his opportunity to defend himself
against the charges." *Contreras v. Artus*, 778 F.3d 97, 113 (2d
Cir. 2015) (citations omitted). "Accordingly, the Supreme Court
has held that '[t]he presence of a defendant is a condition of
due process to the extent that a fair and just hearing would be
thwarted by his absence, and to that extent only.'" *Id.* (quoting
*United States v. Gagnon*, 470 U.S. 522, 526 (1985).

        Applying these principles to the instant case,
Petitioner has failed to demonstrate that his ability to defend
himself was at all compromised by his exclusion from the trial
court's private interview of Pimentel. Rather, the proceeding
involved a legal discussion between a witness and the court

regarding whether the witness had grounds for invoking the Fifth Amendment in response to a specific question. Viewing the record as a whole, Petitioner's presence during that discussion could not have contributed to his defense. Accordingly, habeas relief is not warranted on this claim.

## Ground Three: The Validity of Petitioner's Jury Trial Waiver

Petitioner asserts that his waiver of the right to a jury trial was invalid because it was based on a misrepresentation from his attorney that, if he were convicted, the sentence he received would run concurrently with the sentence imposed for his conviction in Kings County of third-degree criminal sale of a controlled substance. According to Petitioner, it is particularly noteworthy that the trial court failed to ask whether he received any promises or inducements for agreeing to the waiver.

As an initial matter, the Appellate Division found that Rahman's jury trial waiver claim was unpreserved. *See Rahman*, 137 A.D.3d at 130. Applying the principles described above, the adequacy of the procedural default in this instance is established. Had Petitioner complied with the contemporaneous objection requirement, the trial judge would have been alerted

40

to his belief that the inquiry into the validity of his waiver
was insufficient and could have asked the appropriate questions.
There is no basis for finding that this is an exceptional case
in which the contemporaneous objection rule was exorbitantly
applied. Thus, as with Petitioner's right to counsel claim,
there is an independent and adequate determination by the
Appellate Division that Rahman procedurally defaulted on this
claim, and it cannot be the basis for habeas relief unless
Rahman can show either (1) cause for his default and actual
prejudice, or (2) that the Court's failure to consider his claim
will result in a fundamental miscarriage of justice. *See Harris*,
489 U.S. at 262. Rahman has failed to show these elements here.
Accordingly, Rahman's right to counsel claim is procedurally
defaulted.

Secondly, this claim is unexhausted. "The exhaustion
doctrine requires that a prisoner seeking to upset his
conviction on federal grounds must have given the state courts a
fair opportunity to review his federal claim and correct the
alleged error." *Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985).
Petitioner's allegation that his waiver was invalid is based on
matters outside the record. Such claims are not properly raised
on direct appeal but instead should be brought in a motion to

vacate pursuant to New York Criminal Procedure Law Section
440.10. Because this statute does not contain a time bar,
Petitioner still has a state remedy for this claim.

Nevertheless, because Petitioner's claim that his
waiver of a jury trial was invalid fails on the merits, Rahman's
jury trial waiver claim is denied despite the lack of
exhaustion. *See* 28 U.S.C. § 2254(b)(2) (permitting a federal
habeas court to deny a claim on the merits "notwithstanding the
failure of the applicant to exhaust the remedies available in
the courts of the State").

Criminal defendants have a constitutional right to
trial by jury, which may be waived. *See Duncan v. Louisiana*, 391
U.S. 145, 157-58 (1968); *Patton v. United States*, 281 U.S. 276,
298 (1930), *abrogated in part on other grounds*, *Williams v.
Florida*, 499 U.S. 78 (1970). However, "before any waiver [of a
jury trial] can become effective, the consent of government
counsel and the sanction of the court must be had, in addition
to the express and intelligent consent of the defendant."
*Patton*, 281 U.S. at 312; *see also Brady v. United States*, 397
U.S. 742, 748 (1970) ("Waivers of constitutional rights not only
must be voluntary but must be knowing, intelligent acts done

42

with sufficient awareness of the relevant circumstances and likely consequences."). The court must ensure that the defendant has waived his right to a jury trial "with sound and advised discretion," *Patton*, 281 U.S. at 312, though it is "not constitutionally required to conduct an on the record colloquy with a defendant prior to a waiver of the right to a jury trial," *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993). Whether there has been a valid waiver of jury trial depends on the totality of the circumstances in each particular case. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942).

Here, the record as a whole indicates that Rahman's jury trial waiver was knowing, intelligent, and voluntary. The court fully explained, on the record, the differences between a bench and jury trial, as well as the costs and benefits of each. The court likewise permitted Petitioner to review his written waiver and discuss it with his attorney. Petitioner then expressly waived his right, both verbally and in writing. As such, the trial court satisfied the requirements under *Patton*. The Appellate Division's affirmance of Petitioner's jury trial waiver was not an unreasonable application of, nor contrary to, Supreme Court precedent.

43

Ground Four: The Effectiveness of Petitioner's Counsel at His
Sentencing Proceeding and the Excessiveness of the Sentence

a. The Ineffective Assistance Claim

Petitioner contends that he received ineffective
assistance of counsel in violation of the Sixth and Fourteenth
Amendments because his trial counsel failed to advance colorable
mitigation arguments during his sentencing proceeding. The
Appellate Division found that Rahman's trial counsel's actions
did not amount to ineffective assistance of counsel. *See Rahman*,
137 A.D.3d at 525. As Petitioner disputes the state court's
application of law, Petitioner can prevail only if he can
establish that the state court's determination was "was contrary
to, or involved an unreasonable application of" Supreme Court
precedent, or was "based on an unreasonable determination of the
facts." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting
28 U.S.C. § 2254(d)).

In the context of an ineffective assistance claim,
Petitioner must show that the state court decision was contrary
to, or an unreasonable application of, *Strickland v. Washington*,
466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy
a two-part test to establish that his Sixth Amendment right to

44

effective assistance of counsel has been violated. A petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that the deficient performance of counsel prejudiced the defense. *See Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 687-88).

For *Strickland's* first prong, objective reasonableness, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted); *see also United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2001) ("Actions or omissions [by counsel] that might be considered sound trial strategy do not constitute ineffective assistance."). A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." *Cox v. Donnelly*, 387 F.3d 193, 198 (2d Cir. 2004).

As to *Strickland's* second prong, prejudice, a petitioner must demonstrate that there is a "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. To satisfy the reasonable probability test, "a defendant *need not show* that counsel's deficient conduct more likely than not altered the outcome of the case." *Henry*, 409 F.3d at 63 (emphasis in original) (citing *Strickland*, 466 U.S. at 693). "The level of prejudice that [a petitioner] need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case." *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (internal quotation marks omitted). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a preponderance* of the evidence to have determined the outcome." *Henry*, 409 F.3d at 64 (emphasis in original) (citing *Strickland*, 466 U.S. at 694).

A federal court reviewing an ineffective assistance of counsel claim under the AEDPA must be "doubly deferential . . . in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" *Woods*, 135 S. Ct. at 1376.

Here, the Appellate Division found simply that
"[Rahman] received effective assistance of counsel at
sentencing." *Rahman*, 137 A.D.3d at 525. "Where a state court's
decision is unaccompanied by an explanation, the habeas
petitioner's burden still must be met by showing there was no
reasonable basis for the state court to deny relief."
*Harrington*, 562 U.S. at 98.


Based on the record in this case, the Appellate
Division's conclusion that Rahman received effective assistance
was not an unreasonable application of *Strickland*. Petitioner
contends that his counsel was ineffective because he failed to
present evidence that Petitioner had a disabled brother;
received two educational degrees and various commendations while
in prison previously; and became gainfully employed after his
release from prison. However, Petitioner had multiple prior
convictions, including one for a violent crime. It would not be
unreasonable to find that the previously described mitigation
evidence is insufficient to overcome the aggravating effects of
Petitioner's criminal past. In other words, even assuming
counsel's failure to present mitigating evidence was objectively
unreasonable, a fairminded jurist could conclude that Rahman was

not prejudiced by the error. Petitioner's claim of ineffective assistance of counsel is therefore dismissed.

### b. The Excessive Sentence Claim

Lastly, Petitioner requests an adjustment of his sentence. This claim is denied because it is unexhausted, and in any event, not cognizable for habeas review.

In state court, Petitioner advanced his excessive sentencing claim on state statutory, rather than federal, grounds. As such, his claim his unexhausted. *See Levine*, 44 F.3d at 125-26 (constitutional challenge to sentencing dismissed as unexhausted where only state statutory challenge was raised on direct appeal in state courts).

Notwithstanding the lack of exhaustion, Petitioner's excessive sentence claim is rejected on its merits because it is not cognizable upon habeas review. *See* 28 U.S.C. § 2254(b)(2).

"No federal question is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Taylor v.*

*Connelly*, 18 F.Supp.3d 242, 268 (E.D.N.Y. 2014) ("An excessive sentence claim may not provide grounds for habeas corpus relief where a petitioner's sentence is within the range prescribed by state law."). The sentenced imposed on Petitioner, a second felony offender standing convicted of four Class "C" violent felony offenses, falls within the New York statutory guidelines. *See* N.Y. Penal L. §§ 140.25[2]; 110/120.10[1], [4]; 265.03[1][b]; 70.02[1][b], [2]; 70.06[6][a].

Therefore, even assuming Petitioner's claim had been framed in Eighth Amendment terms, his sentence falls within the limits set by New York law and therefore Petitioner's claim provides no grounds for federal habeas relief.

**Conclusion**

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is denied.

It is so ordered.

**New York, NY**
**January** *14,* **2019**

_____
**ROBERT W. SWEET**
**U.S.D.J.**